```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```
_____

JUDITH A. BUCKENMEYER,

                       Plaintiff,              05-CV-0531

            v.                               **DECISION**
                                                       **and ORDER**

JO ANNE B. BARNHART, Commissioner
of Social Security

                       Defendant.
_____

## INTRODUCTION

Plaintiff Judith A. Buckenmeyer ("Buckenmeyer" and/or "plaintiff") brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, (the "Act") claiming that the Commissioner of Social Security improperly denied her application for disability insurance benefits.[1] Specifically, plaintiff alleges that the decision of an Administrative Law Judge ("ALJ") was erroneous and not supported by the substantial evidence contained in the record. The Commissioner moves for judgment on the pleadings on grounds that the ALJ's decision was correct, and that substantial evidence exists in the record which supports the finding that plaintiff's alleged impairments did not prevent her from performing substantial gainful activity. Plaintiff also moves for judgment on the pleadings asking that the Commissioner be reversed and this matter be remanded for payment of benefits or, in the alternative, for a new hearing. For the reasons stated herein, the ALJ's decision is reversed and the case is remanded to the Commissioner for calculation of benefits.

## BACKGROUND

On March 13, 2003, plaintiff, then aged 42 years old, applied for Social Security disability benefits claiming that she was disabled since January 24,

---

[1]This case was transferred to the undersigned by the Honorable Richard J. Arcara, Chief Judge, United States District Court for the Western District of New York by Order dated April 5, 2007.

2003 due to severe medical impairments, including a recurrent Hepatitis C liver infection despite aggressive drug therapy, and by the debilitating side effects of that treatment. T. 71-73. Plaintiff's application was initially denied, and thereafter, she requested an administrative hearing before an ALJ which took place on October 1, 2004. T. 45-49. In a decision dated October 28, 2004, the ALJ found that plaintiff was not disabled. The ALJ found that despite plaintiff's impairments, she could perform sedentary work, which did not require more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling and climbing ramps and stairs; did not require her to climb ladders, ropes or scaffold,; did not involve exposure to cold temperature extremes on a prolonged basis; and did not require exposure to dangerous machinery and unprotected heights. T. 30, 32. In addition, the ALJ found that plaintiff should be limited to simple, repetitive, routine tasks which are not performed in a production or quota based environment and which involve only simple work-related decisions and relatively few work place changes. T. 32.

    The ALJ also found that plaintiff's residual functional capacity ("RFC") did not permit her to perform her past relevant work. T. 31. Relying on vocational expert testimony, the ALJ determined that there were a significant number of jobs in the national economy which plaintiff could perform. Finally, the ALJ evaluated plaintiff's testimony and found her "not fully credible." T. 27. For instance, the ALJ credited plaintiff's subjective complaints, but not to the disabling extent alleged by her. Based on the claimant's testimony, he found that plaintiff has no problems with personal care, that she can prepare meals, she can do some cleaning and laundry, and she goes grocery shopping. T. 29. Moreover, the ALJ disregarded the opinion of plaintiff's primary care physician, Dr. Javeed Mir, as being conclusory in

nature and not supported by any objective evidence in the record. T. 30. Thus, the ALJ afforded only minimal weight to Dr. Mir's opinions.

Plaintiff's request for review of the ALJ's decision by the Appeals Council was denied on May 26, 2005, and on July 29, 2005, plaintiff filed this action.

## **DISCUSSION**

### I.   **Jurisdiction and Scope of Review**

42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938). Section 405(g) thus limits the Court's scope of review to determining whether or not the Commissioner's findings were supported by substantial evidence. See Monqeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (finding a reviewing Court does not try a benefits case de novo). The Court is also authorized to review the legal standards employed by the Commissioner in evaluating plaintiff's claim.

The Court must "scrutinize the record in its entirety to determine the reasonableness of the decision reached." Lynn v. Schweiker, 565 F.Supp. 265, 267 (S.D. Tex. 1983) (citation omitted). Defendant asserts that her decision was reasonable and is supported by the evidence in the record, and moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules. Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by

considering the contents of the pleadings. <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639 (2d Cir. 1988). If, after reviewing the pleadings, the Court is convinced that "plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief," judgment on pleadings may be appropriate. <u>Conley v. Gibson</u>, 355 U.S. 41, 45 (1957).

## II.   **Plaintiff's Medical History**

### A.   **Treating Physicians**

Plaintiff contracted the hepatitis C virus in 1989 when she received tainted blood during the course of a blood transfusion in connection with the birth of her child via a caesarian section delivery. T. 162. Dr. Mir, a Board-certified internist, began treating plaintiff in December 1996 as her primary care physician. T. 141. In August 2002, he ordered testing for the hepatitis C virus upon learning that the blood plaintiff received through the blood transfusion in 1989 may have been infected. T. 133. Plaintiff's liver biopsy in October 2002 confirmed she did have the hepatitis C virus. <u>Id.</u> As a result, plaintiff was referred to Dr. James M. Stormont, a liver disease specialist associated with the Greater Rochester Digestive & Liver Disease Center. T. 204. On December 11, 2002, Dr. Stormont prescribed that plaintiff undergo the required 12-month course of treatment for the hepatitis C virus from January 2003 through December 2003. T. 204-221. The prescribed medication consisted of weekly injections of Interferon alpha-2b, two monthly injections of a Twinrix vaccine and Ribavirin twice daily. T. 220.

In January 2003, plaintiff reported to Dr. Stormont that she had obtained her prescriptions for interferon treatment of the hepatitis C virus. At plaintiff's February 2003 appointment, the doctor noted that after taking four interferon shots for the previous month, plaintiff experienced "significant toxicity in the form of flu-like symptoms, restless sleep, hair

loss, fatigue, difficulty focusing and loss of appetite.[2] T. 219. Plaintiff had also lost five pounds and had a secondary upper respiratory infection. Id. In March 2003, plaintiff saw Dr. Stormont again, and complained of fatigue with severe aching and stiffness following receipt of her interferon shots, as well as some nausea, trouble sleeping and occasionally finding it hard to think. T. 218. The doctor noted that plaintiff lost another six pounds. He also determined that plaintiff was becoming depressed and prescribed Celexa. In April 2003, it was noted that plaintiff lost yet another eight pounds and that side effects from the hepatitis C therapy included fatigue, myalgia and decreased appetite. T. 156. The doctor also reported that although Celexa had helped plaintiff with her fatigue and "foggy thinking," the insomnia continued to be a problem. He also stated that the "plaintiff is unable to perform ... her responsibilities as a medical biller due to difficulty concentrating and fatigue." Id.

During her May 2003 visit, Dr. Stormont opined that plaintiff continued to have chills, fever and aching for 24 hours following her interferon injections, trouble sleeping the first night following an injection and frequent headaches, which were worse after the injection. T. 217. In June 2003 Dr. Stormont noted that plaintiff continued to have the following side effects including "fatigue, shortness of breath on exertion, difficulty sleeping ..., right frontal headaches, body aches, chills, and fever ... diarrhea one to two times a day." He also reported that plaintiff was "unable to work as an office worker due to her depression, difficulty concentrating, fatigue, headaches and body aches." T. 183. Plaintiff agreed to be part of the Greater Rochester Digestive & Liver Diseases Center comparative therapy study to evaluate the

---

[2]These side effects are consistent with those listed in printouts describing plaintiff's prescribed medications provided to plaintiff be her pharmacy. T. 128-131.

various medications she was taking. In August 2003, the comparative study progress note indicated that plaintiff's side effect profile was a 2 on a scale of 1 to 4. T. 215. Specific adverse events rated as a 1 on this scale included: chills, fever, body ache, dizziness, headache, diarrhea, irritability, impaired concentration, cough, alopecia, rash and insomnia while fatigue was rated as a 2. Id.

At treatment week 36 in September 2003, plaintiff's side effect profile showed a rating of 1 (out of a possible 4+) for chills, body ache, dizziness, fatigue, headache, diarrhea, depression, short-term memory loss, impaired concentration, cough, dyspnea, rash and insomnia. T. 208-209. Plaintiff finished her treatment in December 2003 but she was still experiencing side effects including body ache, arthralgia, headache, diarrhea, depression, irritability, short term memory loss, impaired concentration and a cough. T. 205. She also experienced fatigue. Id. Plaintiff also saw Dr. Mir again in March 2004 for hypertension. T. 186. In April 2004, Dr. Mir diagnosed plaintiff with hepatitis C, depression,[3] hypothyroidism,[4] rheumatoid arthritis[5] and hypertension and he prescribed medication. T. 185. Plaintiff continued seeing Dr. Mir in May and again in July 2004 when she complained of joint pain, stiffness in the morning and left elbow pain. T. 246.

Dr. Mir prescribed a second liver biopsy to be performed in September 2004, one month prior to her hearing, which confirmed that plaintiff had a relapse and was again diagnosed with chronic hepatitis C virus. T. 25. Dr.

---

[3] Plaintiff's depression causes her to be confused very easily and have difficulty concentrating. Plaintiff notes that both during and since her hepatitis C therapy she must read an article in the newspaper repeatedly before she understands it.

[4] Symptoms include being very cold with her hands getting numb and tingly, inability to write or grasp a glass and she is constantly tired.

[5] Symptoms include painful joints in her feet, hands, fingers, wrists, arms, elbows, legs and back.

William Y. Chey[6] performed the liver biopsy and reported that for one week after the biopsy the plaintiff experienced right-sided pain. T. 251. She also continued to experience backaches, joint aches and increased fatigue. Id. On September 20, 2004, Dr. Mir completed a functional capacity assessment relating to plaintiff's ability to do work-related physical activities sustained throughout a regular work schedule, defined as eight hours per day, five days per week on a continuing basis. T. 245. Dr. Mir. opined that since January 2003, plaintiff had been unable to lift and carry or push and pull any weight, was only able to sit for up to a maximum of two hours a day, and was only able to stand and/or walk for a maximum of two hours a day. Id.

### B.     Non-Treating Physicians

Dr. Michael Obrecht, D.O., an Osteopath whose specialty is Family Practice, conducted a one-time consultative examination of the plaintiff on April 19, 2003, without the benefit of reviewing any of her medical records since none were available for review at that time. T. 157. Plaintiff informed him of the multiple side effects she was experiencing from the hepatitis C treatment[7] and her daily activities including trying to cook twice a week, some light cleaning weekly, laundry with help and shopping. T. 158. Dr. Obrecht believed that plaintiff would be restricted with respect to heavy lifting, carrying, pushing, pulling during her treatment for hepatitis C. He reported that plaintiff appeared to be depressed, which could stem from her treatment, and that she was taking an anti-depressant. T. 160.

Christine Ransom, Ph.D. conducted a psychiatric evaluation of the plaintiff in April 19, 2003. T. 161-164. Plaintiff complained of side effects

---

[6] Dr. Chey, who worked in the same office as Dr. Stormont, took over the care of plaintiff following Dr. Stormont's retirement.

[7] The side effects included: upset stomach, flu-like symptoms, headaches, chills, fatigue, muscle aches, hearing loss, weight loss, diarrhea, trouble sleeping, difficulty concetrating, feeling tingling in her hands and rashes.

from the hepatitis C therapy including difficulty sleeping due to symptoms of her treatment, loss of weight since January 2003, irritability, poor energy level, difficulty with memory and concentration due to being fatigued, socially withdrawn, inability to go any place due to lack of energy and frequent pain and fevers. T. 161-162. Plaintiff also reported that she was not cooking or cleaning due to fatigue but liked to help with grocery shopping and drove only occasionally. T. 163. However, plaintiff did not socialize since she was too fatigued and did not have the energy to pursue hobbies. Id. Based on her examination of the plaintiff, Dr. Ransom concluded that plaintiff could follow and understand simple directions and instructions, perform simple rote tasks, maintain attention and concentration for simple tasks, consistently perform simple tasks and learn new simple tasks. Id. Dr. Ranson opined that plaintiff would have mild to moderate difficulties performing complex tasks and appropriately dealing with stress due to a mild to moderate major depressive disorder. T. 164.

### III.  **Plaintiff's Non-Medical Evidence**

For approximately 20 years prior to the time her treatment for hepatitis C began in January 2003, plaintiff worked full time in various office jobs. T. 74, 84, 156, 269. As a full time employee, she had longevity in two of her jobs, initially as a Parts Return Clerk for a large equipment manufacturer for 11 years, and then as a Patient Account Representative for a hospital for 9 years. T. 84, 93. Plaintiff testified that the side effects from her treatment included fatigue, flu-like symptoms, joint aches, headaches, fever, chills, diarrhea and depression. T. 272-275. Plaintiff stated that she continued to experience these side effects even after the conclusion of her treatment. Id. She also complained that she had difficulty concentrating, she became confused and felt depressed and tired even after she completed her course of treatment.

Moreover, plaintiff testified that since her treatments began in January 2003, her daily activities have been limited. For instance, she is unable to work full time, take care of her family, pets, home and yard like she used to before she became sick. T. 101. Between the hours of 9:00 a.m. to 5:00 p.m. she lies down to sleep or rest for approximately three hours and sits to rest for about two hours. T. 270. Even after her treatment ended, she still needed five to six hours of rest a day. T. 274. Plaintiff has been unable to go to work, go out with friends, or go to her son's school functions or teacher conferences. T. 105, 258, 265. She limits her driving to short trips (within 15 minutes of her house) and avoids it altogether if she is not feeling well or has family members drive for her. T. 273. Cooking is limited to sandwiches, heating something in the microwave or quick and easy meals, which take 10 to 15 minutes to prepare or take out meals because plaintiff is without energy to do more. T. 262. In addition, her laundering is limited to folding and putting clothes away but she must stop and rest every five minutes because the repetitive use of her hands and arms cause painful aching in her joints. T. 265. Hobbies and interests have been reduced to reading the newspaper and watching television.

The ALJ sought the testimony of Julie Andrews, a vocational expert ("VE"). The ALJ asked the VE to consider a hypothetical individual of plaintiff's age, education level, vocational background and RFC and whether jobs existed in the national economy that such an individual could perform. T. 278. In response, the VE identified two different unskilled jobs of order clerk and surveillance system monitor. T. 278-279. However, when the ALJ added another factor, that of a hypothetical individual whose impairments require more than the typical breaks allowed for unskilled work, defined as one absence a month, a 15-minute break in the morning and afternoon, and a half

hour lunch break, the VE opined it would have a negative impact on performing "any and all positions." Id. In the VE's opinion, she would expect such an individual to get hired but be unable to maintain the job. Id.

Moreover, plaintiff's counsel added another factor to the original question, that of a hypothetical individual who due to diarrhea needed to be away from her work station on a daily basis, two to three times a day, on an unscheduled basis, apart from breaks and lunch, for a minimum of 15 to 20 minutes. Id. The VE again opined that this factor would have a negative impact on the individual's ability to maintain a job. Id. In addition, the VE noted that in terms of attention to tasks, unskilled jobs have minimum requirements for sustained concentration and attention. T. 280. She further stated that even if an individual can remain physically present at their work stations but are unable to maintain even a low grade level of concentration and attention, this would impact that person's ability to maintain and retain that job. Id.

### IV. **The Commissioner's decision to deny Plaintiff benefits was erroneous and not based on substantial evidence in the record**.

The ALJ found at step one[8] that plaintiff had not engaged in substantial gainful activity since January 24, 2003. In steps two and three, the ALJ concluded that the medical evidence established that plaintiff has a severe impairment, but not an impairment or combination of impairments that would

---

[8] The Commissioner uses a five-step process when making disability determinations. See 20 C.F.R. §§ 404.1520 and 416.920. The Second Circuit has described the process as follows:
First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform. See Rosa, 168 F.3d at 77. Plaintiff bears the burden of proof as to the first four steps, while the Commissioner bears the burden in the final step. See Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir.1998).

automatically entitle her to benefits. Before moving to step four, the ALJ determined that plaintiff retained the RFC to perform the physical exertion requirements of sedentary work.[9] In step four, the ALJ found that plaintiff was unable to perform her past relevant work as a parts clerk and an account information clerk. Finally, in step five, the ALJ concluded that in light of plaintiff's age, high school education plus two years of college, and RFC for sedentary work, the relevant regulations indicated that plaintiff was not disabled as defined in the Act.

At issue in this case are the ALJ's conclusions in step three and five that plaintiff has the RFC to perform sedentary work and is not disabled. During the hearing before the ALJ, plaintiff testified that she suffered several side effects from her treatment including fatigue, flu-like symptoms, joint aches, headaches, fever, chills, diarrhea and depression. T. 272-275. She also indicated that she experienced joint aches, chills and numbing of her hands even after the conclusion of her treatment. Id. She also complained that she had difficulty concentrating, became confused and felt depressed and tired even after she completed her course of treatment. The ALJ determined that plaintiff's subjective complaints were "not fully credible" (T. 27) and as a result, concluded that plaintiff had the RFC to perform the minimal exertion required for sedentary work.

Social Security regulations require an adjudicator to determine the extent to which a claimant's symptoms affect the claimant's functional capacity. See 20 C.F.R. § 416.929(c)(3); see also Evaluations of Symptoms in

---

[9] Specifically the ALJ found that plaintiff's ability to perform the full range of sedentary work is limited by work that requires more than occasional postural maneuvers, such as balancing, stooping, kneeling, crouching, crawling and climbing ramps and stairs, work that requires climbing ladders ropes and scaffolds, work that requires exposure to cold temperature extremes on a prolonged basis, work that requires exposure to dangerous machinery and unprotected heights, and work that requires more than simple, repetitive, routine tasks not performed in a production or quota based environment involving only simple, work-related decisions and relatively few work place changes. T. 32.

Disability Claims: Assessing the Credibility of an Individual's Statements, Social Security Ruling 96-7p, 61 Fed.Reg. 34,483, 34,484 (July 2, 1996) ("SSR 96-7p") ("[T]he intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities."). An ALJ must "carefully consider the individual's statements about symptoms" along with all of the other evidence in the case record, and must make findings about the credibility of the claimant's statements. See SSR 96-7p, 61 Fed.Reg. at 34,484.[10] "An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." Id. An ALJ will consider the following factors when evaluating a claimant's symptoms: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has received for relief of his pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of his pain or other symptoms; (6) any measures the claimant uses or has used to relieve his pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. See 20 C.F.R. § 416.929(c)(3). Conclusory findings of a lack of credibility cannot be sustained against a claimant. Rather, an ALJ's decision "must contain specific reasons for the finding on credibility,

---

[10] See also 20 C.F.R. § 416.929(c)(4) ("Your symptoms, including pain, will be determined to diminish your capacity for basic work activities ... to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.") (emphasis supplied).

supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 61 Fed.Reg. at 34,484.

Plaintiff contends that the ALJ erred in failing to credit plaintiff's subjective complaints of pain. The ALJ found that plaintiff's testimony at the hearing regarding the severity and disabling nature of her pain was largely inconsistent with her daily activities and the medical evidence. However, in evaluating plaintiff's subjective allegations, the ALJ failed to properly give weight to various factors, specifically the type, dosage, effectiveness and side effects of medication and other treatment that relieves pain. See 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(30. The ALJ did not fully credit plaintiff's disability caused by the toxic side effects of 48 weeks of therapy for the hepatitis C virus. The side effects from plaintiff's ongoing treatment prevented her from performing her job as a medical biller and from performing any other type of work. Plaintiff complained of difficulty concentrating and fatigue caused by the hepatitis C treatment. The various medications plaintiff received seriously affected her immune system, which gave her significant disabling side effects. The side effects she complains of, and which her physicians reported, were the very same side effects which the drug manufacturers warned of in their medical literature: including fatigue, flu-like symptoms, depression, weight loss and irritability. T. 128-131. Further, the reports of Dr. Stormont and Dr. Chey documented the disabling side effects of the medication that plaintiff experienced beginning in January 2003 and continuing through the hearing conducted by the ALJ such as body ache, arthralgia, headache, diarrhea, depression, irritability, short term memory loss, impaired concentration, and cough.

Further, the Second Circuit has observed that "ALJs are specifically instructed that credibility determinations should take account of 'prior work history,'" and that "a good work history may be deemed probative of credibility." Schaal v. Apfel, 134 F.3d 496, 502 (2d Cir.1998) (citing 20 C.F.R. § 416.929(c)(3); and Social Security Ruling 96-7p, 61 Fed. Reg. 34, 483, at 34, 486 (1996)). See Rivera v. Schweiker, 717 F.2d 719, 725 (2d Cir.1983) ("A claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability."). In the instant case, the ALJ, failed to adequately credit plaintiff's work history. For approximately 20 years prior to the time her treatment for hepatitis C began in January 2003, plaintiff worked full time in various office jobs. T. 74, 84, 156, 269. As a full time employee, she had longevity in two of her jobs, initially as a Parts Return Clerk for a large equipment manufacturer for 11 years and then as a Patient Account Representative for a hospital for 9 years. T. 84, 93. This is probative of plaintiff's credibility regarding her claim of disability. See Rivera, 717 F.2d at 725.

**V.   Opinions of Treating and Examining Physicians**

The ALJ is required to give the opinions of the claimant's treating physicians controlling weight if the opinions are well-supported by the medical evidence in the record as a whole. 20 C.F.R. § 404.1527(d)(2). Further, when evaluating a claim, he must consider "objective medical facts, diagnoses or medical opinions based on these facts, subjective evidence of pain or disability (testified to by the claimant and others), and educational background, age and work experience." Dumas v. Schweiker, 712 F.2d 1545, 1550 (2d Cir.1983) (quoting Miles v. Harris, 645 F.2d 122, 124 (2d Cir.1981)). If the opinion of the treating physician is supported by medically acceptable techniques, results from frequent examinations, and the opinion supports the

administrative record, the treating physician's opinion is to be given controlling weight. See Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir.1993). In addition, the ALJ must give good reasons in his decision as to weight afforded the treating physicians' opinions. See Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999).

Here, the ALJ improperly discounted the opinion of Dr. Mir, plaintiff's treating internist. The record reveals that Dr. Mir submitted a Treating Physician's Functional Capacity Assessment dated September 20, 2004 regarding plaintiff's ability to do work-related physical activities sustained throughout a regular work schedule. T. 245. Dr. Mir opined that since January 24, 2003, plaintiff has been unable to lift, carry, or push and pull any weight, was only able to sit for up to a maximum of two hours a day, and was only able to stand and/or walk for a maximum of two hours a day. The ALJ improperly disregarded Dr. Mir's opinion with respect to plaintiff's physical RFC stating that Dr. Mir's opinion is "conclusory in nature." T. 30. The ALJ's decision ignores the lengthy physician-patient relationship between plaintiff and Dr. Mir, which began in December 1996 when he started treating her. Dr. Mir saw plaintiff on a regular basis both before and after she was diagnosed with hepatitis C virus and the record is replete with letters to and from Dr. Mir from treating specialists, Drs. Stormont and Chey, as well as copies of diagnostic and lab results relating to plaintiff's progress. T. 144-147, 153, 156, 183, 187-204. The ALJ's determination failed to mention any of these factors, which are indicative of a long-term treating doctor-patient relationship of a primary care physician.

The ALJ's reliance upon the one-time consultative medical evaluation performed by Dr. Obrecht, who saw plaintiff on April 19, 2003 and who did not review any of her extensive medical records is misplaced. T. 157. As a

non-treating osteopath practicing in family medicine, Dr. Obrecht is less qualified to render an opinion than her long-standing treating physician Dr. Mir, concerning liver disease, the effects of the treatment for hepatitis C, and plaintiff's ability to work. Moreover, the ALJ's decision cites Dr. Obrecht's opinion that plaintiff "would have restrictions for exertional activities including heavy lifting, carrying, pushing and pulling ..." T. 157), which is "so vague as to render it useless" in determining whether plaintiff has the RFC to sustain work at a sedentary or modified sedentary occupation. See Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000). A fair reading of his report indicates that Dr. Obrecht diagnosed plaintiff as having "flu-like symptoms, rash, depression, and paresthesias with side effects of treatment for hepatitis C" and opined that plaintiff "is having multiple side effects with the medications, which can be expected to last for the duration of the therapy." T. 157-160. Without evaluating her medical records, his examination and opinion is at best a snap shot of her condition at that moment without any appreciation for the effect on her liver and overall body functions of extensive interferon treatment for hepatitis C.

The record shows that the ALJ failed to give proper weight to the toxic side effects of the prescribed medications for plaintiff's hepatitis C virus given to plaintiff over a 48-week period, which rendered her disabled.

## **CONCLUSION**

For the reasons set forth above, I find there is substantial evidence in the record to support plaintiff's claim of disability. I therefore grant plaintiff's motion for judgment on the pleadings and reverse the Commissioner's determination that plaintiff is not disabled. I remand this

case to the Commissioner solely for the calculation and payment of benefits. Defendant's motion for judgment on the pleadings is denied.

ALL OF THE ABOVE IS SO ORDERED.

                                                      s/Michael A. Telesca
                                                        MICHAEL A. TELESCA
                                                United States District Judge

Dated:    Rochester, New York
           May 17, 2007